

**SIGNED this 14 day of April, 2006.**

_____
**R. Thomas Stinnett
UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

In re:                                                                                     No. 04-13828
                                                                                           Chapter 13
JAMES EDWARD RUPERT, JR.
LYNDA SHARON RUPERT,

       Debtors.


Appearances:   James B.M. Hooper, Grisham, Knight & Hooper, Chattanooga, Tennessee,
               Counsel for Movant, Custom Leasing, Inc.

               Kenneth C. Rannick, Kenneth C. Rannick, P.C., Chattanooga, Tennessee,
               Counsel for Debtors

R. Thomas Stinnett, United States Bankruptcy Judge

**MEMORANDUM**

       James and Lynda Rupert, the debtors, filed their Chapter 13 case on June 15, 2004. A copy of their proposed plan was sent to Custom Leasing. The plan was confirmed on September 9, 2004. About six months before the Ruperts filed their chapter 13 case, Mr. Rupert acquired a piece of

1

equipment for his embroidery business by means of a contract with Custom Leasing. This memorandum deals with Custom Leasing's motion for relief from the stay so that it can take possession of the equipment.

The contract between Custom Leasing and Mr. Rupert is identified as a lease, but the law recognizes a distinction between a true lease and a lease that creates a security interest. Tenn. Code Ann. § 47-1-201(38). The Ruperts proposed a chapter 13 plan that treated the lease as creating a security interest. In other words, the plan treated Custom Leasing as if it loaned Mr. Rupert the money to buy the equipment and retained a security interest in the equipment to secure the debt.

The plan provided that Custom Leasing would be paid the value of the equipment plus interest. It valued the equipment at $14,000, set the interest rate at 6%, and provided for monthly payments of $278. The term of the plan was 60 months, which was enough time for the debtors to complete the proposed payments to Custom Leasing. The law required the plan to deal with Custom Leasing's claim in this way if Custom Leasing was a secured creditor instead of a lessor. 11 U.S.C. § 1325(a)(5) & § 1322(d) (2004). The total amount to be paid to Custom Leasing under the plan was substantially less than the total of the remaining rental payments under the lease.

Custom Leasing did not file a timely objection to confirmation of the plan. The debtors did not file a complaint, a motion, or an objection to determine whether the lease is a true lease or creates a security interest. The court confirmed the plan with Custom Leasing treated as a secured creditor. Several months later, Custom Leasing filed its motion for relief from the stay. Custom Leasing contends it should be allowed to take possession of the equipment because Mr. Rupert is not complying with the terms of the lease. Of course, Mr. Rupert is not complying with the lease because the confirmed chapter 13 plan treats the lease as creating a security interest. Custom Leasing's motion raises the question of whether the order confirming the chapter 13 plan is a binding decision against Custom Leasing on the question of whether the lease is a true lease or creates a security interest.

As a general rule, a confirmed plan binds a creditor that failed to file a timely objection to confirmation *if* the creditor received notice of the proposed plan in time to file a timely objection and

2

the notice adequately informed the creditor of how the proposed plan would affect its claim. 11 U.S.C. § 1327(a); *see, e.g., In re Keaton*, 182 B.R. 203 (Bankr. E. D. Tenn. 1997), *aff'd* 212 B.R. 587 (E. D. Tenn. 1997), *vacated* 145 F.3d 1331 (6th Cir. 1998) (rendered moot by settlement); *In re Rogers*, 180 B.R. 504 (Bankr. E. D. Tenn. 1995). Custom Leasing originally argued lack of notice but did not pursue that argument at the hearing on the motion to lift stay. Custom Leasing argues that the confirmed plan is not binding on it as to the nature of the lease because the question of whether the lease is a true lease or creates a security interest should have been litigated in a separate proceeding, not as part of the confirmation process.

The court of appeals' decision in *Ruehle* gives some support to this argument. *Ruehle v. Educational Credit Management Corp. (In re Ruehle)*, 412 F.3d 679 (6th Cir. 2005); *see also In re Vankell*, 311 B.R. 205 (Bankr. E. D. Tenn. 2004). *Ruehle* involved a chapter 13 plan that provided for discharge of a student loan debt after paying a small percentage under the plan. The rules of procedure required the debtor to file a complaint – to commence a separate adversary proceeding – if she wanted the bankruptcy court to decide whether the student loan debt could be discharged. The question in the adversary proceeding would have been whether repayment of all or a portion of the debt would impose an undue hardship on the debtor and the debtor's dependents. 11 U.S.C. § 523(a)(8) (2004); Fed. R. Bankr. P. 4007 & 7001. Instead of filing a complaint, the debtor's chapter 13 plan provided for discharge of the balance of the student loan debt after completion of the plan payments. The plan attempted to justify the discharge by making a finding that requiring the debtor to pay the balance of the debt would impose an undue hardship on the debtor. The court confirmed the plan without any objection by the student loan creditor. After the debtor completed the plan and received a discharge, the creditor's assignee attempted to collect the unpaid part of the student loan debt. The debtor opposed collection on the ground that the debt had been discharged. The debtor argued that failure to file a complaint did not prevent confirmation of the plan from being a judgment that was binding on the creditor as to discharge of the student loan debt. The lower courts disagreed and held that the debt was not discharged. The court of appeals affirmed. The creditor was entitled to believe the question of

3

dischargeability (undue hardship) would be decided only in a separate adversary proceeding, and no kind of notice that the plan was intended to decide the question would have satisfied the constitutional requirement of due process. Since the dischargeability question could not be incorporated into the confirmation process, the question was still open for decision.

This case might have been distinguished from *Ruehle* on the ground that an adversary proceeding was not required to litigate the question of whether the lease is a true lease or creates a security interest. *In re Durham*, 260 B.R. 383 (Bankr. D. S. C. 2001); *HPSC, Inc. v. Wakefield (In re Wakefield)*, 217 B.R. 967 (Bankr. M. D. Ga. 1998); *In re QDS Components, Inc.*, 292 B.R. 313, footnote 23 (Bankr. S. D. Ohio 2002); *In re Smith*, 259 B.R. 561 (Bankr. D. S. C. 2000); *In re Wallace*, 122 B.R. 222 (Bankr. D. N. J. 1999). The court decided, however, that judicial economy favored having a hearing on the nature of the lease. If the hearing resulted in a decision against Custom Leasing, then the court would not be required to decide whether confirmation of the plan was a binding decision as to the nature of the lease. *See Tully Constr. Co. v. Cannonsburg Environmental Associates, Ltd. (In re Cannonsburg Environmental Associates, Ltd.)*, 72 F.3d 1260 (6th Cir. 1996) ; *see also Securities and Exchange Commission v. Basic Energy & Affiliated Resources, Inc.*, 273 F.3d 657 (6th Cir. 2001). A hearing on the motion would also allow all the major issues to be included in one appeal if either party appealed. Finally, the evidence was likely to be stipulations and undisputed documents, without the need for testimony. The court set Custom Leasing's motion to lift stay for hearing to include the question of whether the lease is a true lease or creates a security interest.

The question of whether a lease is a true lease or creates a security interest is not governed by federal bankruptcy law. It is governed by the law that would apply if there were no bankruptcy case. *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). The lease provides that Pennsylvania law applies. Exh. 2, ¶ 24. Since this dispute involves only the parties to the lease, the court is not concerned with whether this choice of law provision is binding on third parties, such as a bankruptcy trustee. Tenn. Code Ann. § 47-1-105(2); *In re Eagle Industries, Inc.*, 223 B.R. 290 (Bankr. E. D. Pa. 1998), *affirmed* 237 B.R. 269 (E. D. Pa. 1999).[1]

The choice of law provision is binding on Mr. Rupert and Custom Leasing if the lease transaction was reasonably related to Pennsylvania. Tenn. Code Ann. § 47-1-105(1); *Compliance Marine, Inc. v. Campbell (In re Merritt Dredging Co.)*, 839 F.2d 203 (4th Cir. 1988); *Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599 (2d Cir. 2001); *In re Wallace's Bookstores, Inc.*, 317 B.R. 709 (Bankr. E. D. Ky. 2004). The heading of the lease gives a Tampa, Florida address for Custom Leasing, but the signature section gives a Pottstown, Pennsylvania address. The equipment seller, SWF East, sent its invoice to Custom Leasing at the Tampa address. Mr. Rupert and Custom Leasing apparently dealt with the Tampa office of SWF East. Exhs. 1, 2, 3. Custom Leasing assigned the lease to a Pennsylvania company. Exhs. 7 & 9. The assignment to a Pennsylvania company appears to be the transaction's primary connection to Pennsylvania. These facts raise the question of whether the lease transaction was reasonably related to Pennsylvania. The court need not deal with that question, however, because it appears to make no difference whether Tennessee or Pennsylvania law applies. The relevant law is the Uniform Commercial Code (the UCC), and it has been adopted in both Pennsylvania and Tennessee. Furthermore, the relevant provisions of the UCC are essentially the same in both states. Tenn. Code Ann. § 47-1-201(38) & § 47-2A-103(1)(j); 13 Pa. Cons.St. Ann. § 1-201; 13 Pa. Cons. St. Ann. § 2A103(a). Neither party argued that Pennsylvania law would lead to a different result from Tennessee law. Therefore, the court will rely on Tennessee law. *In re Village Import Enterprises, Inc.*, 126 B.R. 307 (Bankr. E. D. Tenn. 1991).

Custom Leasing contends the lease to Mr. Rupert is a true lease because it qualifies as a "finance lease" under Article 2A of the UCC. Tenn. Code Ann. § 47-2A-103(1)(g). The transaction between Mr. Rupert and Custom Leasing followed the usual pattern for creation of a finance lease. Mr. Rupert picked out a piece of embroidery equipment that could be acquired from SWF East, and Custom Leasing agreed to provide financing but not in the form of a loan to Mr. Rupert. Instead, Custom Leasing agreed to buy the equipment from SWF East and lease it to Mr. Rupert. Exh. 2, ¶ 3.

The lease appears to meet the criteria for a finance lease set out in UCC § 2A-103. Mr. Rupert is absolutely liable for the rent for the full term of the lease. Custom Leasing did not make any

5

warranties as to the equipment and is not liable under the manufacturer's or seller's warranties. Mr. Rupert has the benefit of the seller's or manufacturer's warranties and their other promises regarding the equipment. Exh. 2, ¶'s 1, 2, 5 & 22; Tenn. Code Ann. § 47-2A-103(1)(g). Indeed, the lease expressly states that it is a "finance lease." Exh. 2, ¶ 3.

Nevertheless, these statutory requirements for a finance lease are second level requirements. They do not repeat a basic requirement found in the definitions. Article 2A deals with true leases. It does not apply to a lease that creates a security interest. The lease may meet the second level requirements of Article 2A for a finance lease, but it will not be a finance lease unless it also meets the basic requirement of being a true lease. If the lease creates a security interest, it is not a true lease and can not be not a finance lease under Article 2A. Tenn. Code Ann. § 47-2A-103(1)(j); *In re Triplex Marine Maintenance, Inc.*, 258 B.R. 659 (Bankr. E. D. Tex. 2000); *In re Yarbrough*, 211 B.R. 654, 656 (Bankr. W. D. Tenn. 1997); 2 James J. White & Robert S. Summers, *Uniform Commercial Code* § 13-2 (4th ed. 1995). The lessor under a finance lease must be financing a lease of the goods, not a secured transaction in the form of a lease.

The UCC's definition of "security interest" sets out the rules for distinguishing a true lease from a lease that creates a security interest. Tenn. Code Ann. § 47-1-201(38).[2] The lease can not make itself a true lease or a finance lease by simply stating that it is a true lease or a finance lease. *See, e.g., In re Triplex Marine Maintenance, Inc.*, 258 B.R. 659 (Bankr. E. D. Tex. 2000); *In re Homeplace Stores, Inc.*, 228 B.R. 88 (Bankr. D. Del. 1998); *Citipostal, Inc. v. Unistar Leasing*, 724 N.Y.S.2d 555, 44 UCC Rep.Serv.2d 691 (App. Div. 2001). The criteria for distinguishing a true lease from a lease that creates a security interest focus on the economic reality of the transaction. 4 James J. White & Robert S. Summers, *Uniform Commercial Code* § 30-3 (4th ed. 1995). For purposes of determining the nature of the lease, the court can refer to and rely on decisions from other jurisdictions that have adopted the UCC. *Davenport v. Chrysler Credit Corp.*, 818 S.W.2d 23 (Tenn. Ct. App. 1991); *Remco Equipment Sales, Inc. v. Manz*, 952 S.W.2d 437 (Tenn. Ct. App. 1987).

6

The question of whether a lease is a true lease or creates a security interest often involves the effect of the lessee's option to purchase the leased equipment. James J. White & Robert S. Summers, *Uniform Commercial Code* § 30-3 (4th ed. 1995). This lease includes an option for Mr. Rupert to purchase the equipment at the end of the lease. The option is on a separate sheet of paper, but Mr. Rupert signed it when he signed the lease, and Custom Leasing approved the lease and the option the day after Mr. Rupert received and accepted the equipment. Exhs. 2 & 4. The court may subsequently refer to the option separately, but "lease" should be understood to mean the lease with the purchase option.

Mr. Rupert wrote Custom Leasing a check for $2,912.19 when he executed the lease in December 2003. This amount was calculated as follows:

| | |
|---|---:|
| Down payment, 10% of cash purchase price | $1,961.45 |
| 2 months rent (first and last months of the lease) | 800.74 |
| Document filing fee | 150.00 |
| TOTAL | $2,912.19 |

Exhs. 1 & 3.

The "Schedule Of Rental Payments" calls for 61 rental payments; it identifies the 10% down payment ($1,961.45) as the first rental payment and calls for 60 more payments of $400.37 each.

Paragraph 2 of the lease provides:

> 2. TERM, RENT AND SECURITY DEPOSIT. The Security Deposit is due and payable at the time the Lessee signs this Lease. The lessor may apply any advance payments as a security deposit. The security deposit may be applied at the end of the lease to satisfy any outstanding late charge or miscellaneous fees. . . . The aggregate rent over the Lease Term shall equal the Total Number of Rental Payments multiplied by the Amount of Each Payment plus applicable sales/use taxes. The lessor may charge a partial or interim rental payment for the time between the date funded and the date the first regular payment is due. The due date of the first Rental Payment is the date upon which the Equipment is delivered to and accepted by Lessee, or any later date designated by Lessor. Lessee agrees that Lessee's obligation to pay all rent and perform all other obligations under this Lease shall be absolute, irrevocable, unconditional, and independent and shall be paid and

7

> performed without abatement, deduction, or offset of any kind or nature whatsoever. Advance rentals and security deposits are not refundable if Lease does not commence for any reason.

The aggregate rent can not be calculated by the method stated in this paragraph because the rental payments are not equal. The first rental payment – the 10% down payment – is much larger than the 60 regular payments.

This paragraph seems to mean that the security deposit could be returned to Mr. Rupert if not needed to pay debts due under the lease. The two months of advance rent must have been the security deposit. Since the down payment was designated as the first rental payment, it must have been a non-refundable payment for the use or purchase of the equipment and not part of a security deposit. This paragraph causes some confusion on the point. Mr. Rupert wrote the check for the down payment when he signed the lease. The security deposit was due then but not the first rental payment. This suggests the paragraph should be interpreted to mean the 10% down payment was part of a security deposit, and the first rental payment was actually the first *regular* rental payment of $400.37. On the other hand, Custom Leasing appears to have held the check or at least not credited the down payment until Mr. Rupert received and accepted the equipment. Exh. 12. Thus, Custom Leasing apparently treated the down payment as the first rental payment, not as part of a security deposit. The court concludes that the down payment was not part of the security deposit.

This paragraph also allowed Custom Leasing to charge interim rent for the time between funding and the first rental payment that was due when Mr. Rupert accepted the equipment. The documents do not explain funding or the date of funding. Custom Leasing may have committed to funding in December 2003 when Mr. Rupert signed the lease, but apparently it did not pay the supplier until January 2004, about the time Mr. Rupert accepted the equipment. Exhs. 12, 9 & 7. The facts do not show that there was any interim period between "funding" and Mr. Rupert's acceptance of the equipment. As a result, the court can not conclude that the down payment was rent for any such interim period.

Even if the down payment was rent for an interim period, it could still be treated as payment for the purchase of the equipment if the facts otherwise show that the lease was not a true lease but created a security interest.

The lease avoids giving Mr. Rupert any equity interest in the equipment. Exh. 2 ¶'s 12, 13, 16, & 18. In this regard, the lease requires the lessee to return the equipment when the lease expires or is terminated, makes the lessee liable for rent at the lease rate if the lessee fails to return the equipment at the end of the lease term, and it makes the lessee liable for the replacement value of the equipment if he fails to return it after a demand by the lessor. Exh. 2, ¶ 18.

If the lease had been in the form of a secured loan, the interest rate would have been roughly 13%. This is based on the financed amount being the cash purchase price minus the 10% down payment ($19,614.55 - $1,961.45 = $17,653.10). If the two advance rent payments are treated as rent to be applied to the last two rental payments or as a security deposit to be refunded if not needed, then the interest rate would be slightly higher. If the two advance rent payments were treated as an additional down payment and deducted from the amount financed, the interest rate would be about 15%.

In conjunction with the lease, Mr. Rupert and Custom Leasing executed the purchase option that provides:

> The above referenced lessor ("Lessor") hereby agrees that if Lessee maintains its account with Lessor in good order and makes prompt and timely payments, after all sums owed to Lessor have been paid in full, Lessee may purchase the above Equipment "AS IS", "WHERE IS" at the end of the lease term for: Fixed Price Purchase Option of 10% of the Total Cash Price, plus applicable taxes and fees.

Neither party introduced any evidence as to the value of the equipment at the end of the lease. Neither the lease nor the option provides that the 10% option price is the expected fair market value of the equipment at the end of the lease.

The lease and the option do not clearly state that the 10% down payment would be treated as the 10% option payment. If so, Mr. Rupert could have become the owner of the equipment at the end of the lease without paying anything in addition to the lease payments except the fees referred to in the option. This probably means fees for transferring title from Custom Leasing to Mr.

9

Rupert. As to taxes, the transaction was apparently exempt from sales or use tax. Exh. 6. The lawyers for both Mr. Rupert and Custom Leasing were of the opinion that the down payment was the option payment, and the option did not require the payment of another 10% of the purchase price.

The coincidence that the down payment and the option price are the same amount – 10% of the cash purchase price – makes the lease ambiguous. It implies that the 10% down payment was a prepayment of the 10% option price. *Ozark Production Credit Assoc. v. First National Bank (In re Clemmons)*, 37 B.R. 712 (Bankr. W. D. Mo. 1984). The court believes this is the correct interpretation of the lease, as explained below.

The 10% down payment was part of the charge for the use or purchase of the leased equipment. If Mr. Rupert was not required to pay another 10% as the option price at the end of the lease, he was paying 13% to 15% for financing to purchase the equipment. Adding an option price of $1,961.45 at the end of the lease would substantially increase Mr. Rupert's cost of becoming the owner of the equipment – even if the court discounts the additional option price because it comes at the end of the five year lease. This suggests that the option was not intended to require Mr. Rupert to pay 10% of the purchase price again.

The lease required Mr. Rupert to continue the regular lease payments of $400.37 per month if he held over without exercising the option and to pay the value of the equipment if he held over after Custom Leasing demanded its return. This raises the question of whether Mr. Rupert would have wanted to keep the equipment at the end of the lease term. Mr. Rupert's chapter 13 plan reveals his desire to keep the equipment and become the owner. It also reveals his belief that the equipment's economic life will last beyond the end of the lease term. If Mr. Rupert had completed the lease payments, it would have made economic sense for him to exercise the option – especially if the option did not require him to pay another 10% of the purchase price.

The lease could have been clear as to whether it required Mr. Rupert to pay another 10% of the purchase price to exercise the option. The failure of lease to provide a clear answer should be held against Custom Leasing since it provided the lease and option forms. *Michaels v. Ford Motor Credit*

10

*Co. (In re Michaels)*, 156 B.R. 584 (Bankr. E. D. Wis. 1993); *Memphis Housing Authority v. Thompson*, 38 S.W.3d 504 (Tenn. 2001) (real estate lease).

When the parties executed this lease, the criteria for distinguishing a true lease from a lease that creates a security interest were much more detailed than in earlier years when the UCC used a shorter definition of security interest. All the states with a connection to this lease had already adopted the more detailed definition of security interest. Tenn. Code Ann. § 47-1-201(38) (Compiler's Note); *In re Murray*, 191 B.R. 309, 313-314 (Bankr. E. D. Pa. 1996); Fla. St. Ann. § 671.201 (Historical and Statutory Notes). The law gave Custom Leasing the guidance to make the lease clearly a true lease *if* that was possible without killing the deal with Mr. Rupert. The failure to draft the lease to make it clearly a true lease implies the lease was intended to bring about a sale to Mr. Rupert.

The court concludes that the 10% down payment was also the 10% option payment. If Mr. Rupert had successfully completed the lease payments, he could have exercised the purchase option without paying any additional money to Custom Leasing or its assignee, except possibly a fee for transferring title.

The court notes that the lease would have had the same effect if the 10% down payment was part of a refundable security deposit. Instead of taking the refund, Mr. Rupert would have applied it to the purchase option because that made more sense economically.

Under the definition of security interest, this makes the lease a lease that creates a security interest. Tenn. Code Ann. § 47-1-201(38)(B)(iv). The result should be the same under Pennsylvania law. *In re Eagle Enterprises, Inc.*, 237 B.R. 269 (Bankr. E. D. Pa. 1999); *In re Kim*, 232 B.R. 324 (Bankr. E. D. Pa. 1999).

The court concludes that the plan correctly treated the lease as a lease that creates a security interest instead of a true lease. At the hearing on the motion for relief from the stay, Custom Leasing agreed that if the court decided that the lease creates a security interest, then the plan was properly confirmed. The court will enter an order denying Custom Leasing's motion.

1.
This issue or distinction may no longer exist in light of the different wording of current § 47-1-105(2). Tenn. Code Ann. § 47-9-301, Official Comment 2.

2.
Section 47-1-201(38) provides:

> (38)(A) "Security interest" means an interest in personal property or fixtures which secures payments or performance of an obligation. . . . ;
>
> (B) Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and
>
> (I) The original term of the lease is equal to, or greater than, the remaining economic life of the goods;
> (ii) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
> (iii) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or
> (iv) The lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement;
>
> (C) A transaction does not create a security interest merely because it provides that:
>
> (I) The present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to, or is greater than, the fair market value of the goods at the time the lease is entered into;
> (ii) The lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service of maintenance costs with respect to the goods;
> (iii) The lessee has an option to renew the lease or to become the owner of the goods;
> (iv) The lessee has an option to renew the lease for a fixed rent that is equal to, or greater than, the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or
> (v) The lessee has an option to become the owner of the goods for a fixed price that is equal to, or greater than, the reasonably predictable fair market value of the goods at the time the option is to be performed;
>
> (D) For purposes of this subdivision (38):
>
> (I) Additional consideration is not nominal if: (*a*) When the option to renew the lease is granted to the lessee the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed; or (*b*) When the option to become the owner of the goods is granted to the lessee the price is stated to be the fair market value of the goods determined at the time the option is to be performed;
> (ii) Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised;
> (iii) "Reasonably predictable" and "remaining economic life of the goods" are to be determined with reference to the facts and circumstances at the time the transaction is entered into; and
> (iv) "Present value" means the amount as of a date certain of one (1) or more sums payable

in the future, discounted to the date certain. The discount is determined by the interest rate specified by the parties if the rate is not manifestly unreasonable at the time the transaction is entered into; otherwise, the discount is determined by a commercially reasonable rate that takes into account the facts and circumstances of each case at the time the transaction was entered into;

. . . .

# # #